IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03157-MEH

NANCY HALSTED,

     Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

     Defendant.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Nancy Halsted appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **affirms** the decision of the Administrative Law Judge ("ALJ") and the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision [AR 75-77] denying her application for SSI benefits filed October 20, 2011. [AR 128-36] Plaintiff initially alleged her

disability began December 31, 2010.  *Id*.  After the application was initially denied [AR 75-77], an ALJ upon the Plaintiff's request held a hearing on June 20, 2013.  [AR 30]  An impartial vocational expert testified at the hearing.  *Id*.  The ALJ issued a written ruling on July 1, 2013, finding that Plaintiff was not disabled since October 20, 2011, because considering Plaintiff's age, education, work experience and residual functional capacity ("RFC"), there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  [AR 13-26]  The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review.  [AR 1-6]  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed her Complaint with this Court seeking review of the Commissioner's final decision.  *See* Complaint, docket # 2.

## II.    Overview of Plaintiff's Alleged Conditions

Plaintiff was born on July 26, 1978; she was 33 years old when she filed her application for SSI benefits on October 20, 2011.  [AR 128]  Plaintiff's initial application for SSI alleged disability as of December 31, 2010, due to mental health impairments.  *Id*.  Plaintiff completed school through the eighth grade and later received her GED.  [AR 42]  In the past, she has had only short-term employment, never working at one job for more than four months.  [AR 43]

Plaintiff alleges disability due to a major depressive disorder, generalized anxiety disorder, and a panic disorder with agoraphobia.  [AR 215-74]  Plaintiff reported it is difficult for her to keep a job because she has "a lot of misunderstandings" and does not get along with people very well.  [AR 43]  She explained that she gets upset easily and has problems understanding things.  *Id.*

### III.    Medical Evidence

On March 10, 2011, Plaintiff had an initial assessment at North Range Behavioral Health

with licenced professional counselor Abbey Keeney.  [AR 215]  At this meeting, Plaintiff indicated

that she had been treated in the past for mental health conditions.  [AR 220]  Keeney provided an

initial diagnosis of bipolar disorder with provisional diagnoses for anxiety disorder, not otherwise

specified, and Cluster B traits associated with a personality disorder.  [AR 224]  Plaintiff was

assigned a Global Assessment of Functioning ("GAF") score of 50.[1]  [AR 225]

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit
describes the GAF as follows: The GAF is a 100-point scale divided into ten numerical ranges,
which permits clinicians to assign a single ranged score to a person's psychological, social, and
occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of
Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the
following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get
out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in
all areas, interested and involved in a wide range of activities, socially effective, generally
satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument
with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial
stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in
social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty
in social, occupational, or school functioning (e.g., occasional truancy, or theft within the
household), but generally functioning pretty well, has some meaningful interpersonal
relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic
attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no
friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical,
obscure, or irrelevant) OR major impairment in several areas, such as work or school, family

On May, 18 2012, Nathan Swisher, Psy.D., confirmed diagnoses for generalized anxiety disorder and panic disorder with agoraphobia.  [AR 224]  This diagnosis was based on Plaintiff's reported symptoms of nearly daily generalized anxiety and recurrent unexpected panic attacks.  [AR 245]  Plaintiff was again assigned a GAF score of 50.  *Id.*  A Service Plan Update, completed by Dr. Swisher on December 31, 2012, confirmed major depressive disorder as a diagnosis.  [AR 250]  Dr. Swisher reported that Plaintiff's personality disorder remained "provisional" but was not confirmed. *Id.*  Plaintiff was assigned an increased GAF score of 52.  [AR 251]

Plaintiff had regular medication management appointments with clinical nurse specialists Jeanine Labaw and Karen Thurman.  [AR 254-65]  Notes from these meetings show Plaintiff was often argumentative and emotional.  *Id.*  At a July 10, 2012 session, Plaintiff indicated she had been doing well since starting to take the ADHD medication Vyvanse.  [AR 259]  However, in August 2012, Plaintiff reported she thought the medication was no longer working as well.  [AR 261] Plaintiff reported doing "about the same" at sessions in October 2012 and December 2012.  [AR

---

relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

263-64]   At the December session, Plaintiff noted she felt worse when she forgot to take the

Vyvanse.  [AR 264]  At a February 2013 session, Plaintiff indicated she also at times forgets to take

her evening dose of the anxiety medicine buspirone.  [AR 265]

On May 7, 2013, Dr. Swisher wrote Plaintiff a letter stating that Plaintiff attended 14 formal

psychotherapy sessions between March 11, 2011, and October 26, 2011, with therapists at North

Range Behavioral Health.  [AR 266]  Dr. Swisher also stated that he had 24 sessions with Plaintiff

between March 26, 2012, and May 7, 2013.  *Id.*  Dr. Swisher indicated that in addition to these

appointments, Plaintiff initiated additional contacts with North Range Behavioral Health and

attended case management appointments.  *Id.*

## III.    Medical Source Opinions

Dr. Swisher completed a Mental Assessment of Work-Related Activities regarding Plaintiff.

[AR 267-74]   Additionally, a consultative examiner hired by SSA, Joyce Ackerman, Ed.D.,

evaluated Plaintiff, and a state agency psychiatrist, Ellen Ryan, M.D., reviewed Plaintiff's record,

both providing opinions as to Plaintiff's RFC.  [AR 63-72, 208-14]

### A.    Nathan Swisher, Psy.D.

On May 7, 2013, Dr. Swisher prepared a Mental Residual Functional Capacity Questionnaire

based on his treatment of Plaintiff. [AR 267-74]  Dr. Swisher diagnosed Plaintiff with major

depressive disorder ("recurrent, in partial remission"), social phobia, and panic disorder. [AR 272]

Plaintiff was assigned a GAF score of 45.  *Id.*  Dr. Swisher noted Plaintiff was actively engaged in

treatment but had made minimal progress. [AR 267]  With regard to the mental abilities and

aptitudes needed to do unskilled work, Dr. Swisher reported Plaintiff's limitations range from "no

useful ability to function" to "limited but satisfactory[.]"  [AR 269]  In explaining this prognosis,

Dr. Swisher stated, "client's functioning in occupational and other interpersonal situations is

significantly impaired due to excessive and severe anxiety problems."  *Id.*  When discussing the

mental abilities and aptitudes needed to do semiskilled and skilled work, Dr. Swisher noted

"[s]tressful work often elicits panic attacks." [AR 270]   Additionally, Dr. Swisher indicated

Plaintiff's impairments and treatments would cause her to miss more than four days of work per

month.  [AR 271]

> B.   Joyce Ackerman, Ed.D.

Dr. Ackerman interviewed Plaintiff on January 25, 2012, and prepared a mental status report.

[AR 208-14] Dr. Ackerman diagnosed Plaintiff with bipolar disorder and assigned her a GAF score

of 50.  [AR 213]  When discussing Plaintiff's capacity, Dr Ackerman stated:

> Although Nancy appears to be a bright individual, she has significant amount of
> difficulty expressing her thoughts in a clear[,] coherent manner.  She also appears to
> have an extremely high level of anxiety and depression.  At this time, she has limited
> support systems, is not on medication, and is not in treatment for her psychological
> issues.  Therefore her current capacity to function independently is significantly
> negatively impacted.

*Id.*  Based on Plaintiff's mental status and capacity, Dr. Ackerman offered the following prognosis:

> Nancy has multiple mental health issues that do not appear to be being addressed
> adequately at this time.  She seems to have limited motivation for following through
> with mediation and treatment both of which would be necessary for to be able to
> function at a more productive level.  If she is not able to obtain some treatment[,]
> including appropriate medication[,] it appears that her prognosis is poor.  (Her
> reported history of psychotic behavior needs to be evaluated and treated by a
> psychiatrist).  Her intellectual level appears adequate to have her be able to manage
> monthly Social Security Disability payments on her own behalf.

[AR 214]

C.      Ellen Ryan, M.D.

Dr. Ryan reviewed Plaintiff's medical records as well as Dr. Ackerman's report and prepared

a Disability Determination Explanation.  [AR 63-72]  In the report, Dr. Ryan provided the following

opinion about Plaintiff's RFC:

> [Claimant] retains the mental ability to do work involving some skills but not
> involving more complex duties; can be expected to do work requiring up to ½ year's
> time to learn techniques, acquire information and develop facility needed for an
> average job performance, supervisors and coworker OK if not frequent or prolonged,
> less interaction with the public[.]

[AR 70]

## IV.     Hearing Testimony

The ALJ held an administrative hearing on June 20, 2013.  [AR 30]  Plaintiff was represented

by counsel and testified at the hearing.  [AR 30, 32-56]  Plaintiff said she completed school through

the eighth grade and subsequently received her GED.  [AR 42] During ninth grade, she left school

and was placed in a facility for mental health issues; later she attempted ninth grade again, but did

not complete it.  *Id.*  She is married but lives alone while her husband lives with his mother.  [AR

34]  Plaintiff has four children, none of whom live with her.  [AR 37-38]  Plaintiff's testimony

showed that she is generally withdrawn but engages in occasional social activities.  She plays

computer games online with her husband.  [AR 36]  Plaintiff also attends private showings of

movies organized by a game store two or three times per year.  [AR 42]  Her husband's friends hold

a cookout once or twice a year, which she sometimes attends.  *Id.*  She does not regularly participate

in other social activities.  *Id.*

Plaintiff also discussed her history of short-term employment.  *Id.*  The longest she had ever

held a job for was four months.  *Id.*  She explained that she only lasted at that job for as long as she did because she worked the night shift and had limited human contact.  [AR 44]  Plaintiff said she could not do that job now, in part because the interview would cause her too much anxiety.  *Id.*  She held another job driving people to their medical appointments for two or three months, but said she could not currently perform that job because she is no longer comfortable driving.  *Id.*  Plaintiff further explained that she would have difficulty working currently because she has difficulty working in close proximity with others, takes criticism personally, and gets distracted easily. [AR 53-54]

Plaintiff testified she usually sees her therapist, Dr. Swisher, every other week.  [AR 46] At the time of the hearing, she was taking Vyvanse and the anxiety medicine Effexor.  *Id.*  She said the Vyvanse helped "quite a bit[.]"  *Id.*  She noted that she had only started taking the Effexor "a couple months" prior to the hearing, but that she had lost motivation for many things, including eating, after she began taking it.  [AR 47]  Plaintiff stated that she had difficulty finding the motivation to do household chores and that this became worse after she began taking the Effexor.  *Id.*

Plaintiffs's attorney questioned her extensively about her anxiety issues.  [AR 47-56]  When asked what types of activities make her nervous, Plaintiff responded "anything that involves outside of my front door[.]"  [AR 47]  However, she did not have problems around her best friend or her husband.  [AR 48]  Plaintiff described problems she has while grocery shopping, including feeling trapped and "get[ting] panicky around people."  *Id.*  She stated that she felt "[w]orn out" when she returned home from tasks such as grocery shopping.  *Id.*  Most activities outside of her home make her feel the same way, but "after [she has] been to a place a lot, then it's not as bad[.]"  [AR 49]

Plaintiff also described having panic attacks in crowded places.  [AR 50]  These attacks cause Plaintiff to hyperventilate and make her feel like she needs to get out of the situation.  *Id.*  It is "pretty much a given" that she will have a panic attack in situations where she is around crowds or unfamiliar people.  *Id.*  For this reason, Plaintiff does not usually go places by herself.  *Id.*  Plaintiff also noted that she had a tendency to withdraw and isolate herself because she does not "handle social situations well" and gets "upset very easily at things."  [AR 51]

Nora Dunne, a vocational expert ("VE"), also testified at the hearing.  [AR 56]  The ALJ asked the VE several hypothetical questions involving "a person who is about the claimant's age of 34, who has a GED and[,] as she puts it in the record[,] a little bit of college, but not enough to even include a full year, and no vocational profile."  [AR 57] The ALJ's first hypothetical queried about a person who "has no physical limitations, is able to understand, remember and carry out moderately complex instructions that can be learned [within] six months, has sustained concentration, persistence, and pace for these in a low stress environment."  *Id.*  The VE testified that there are occupations such a person could perform, including tray worker, price marker, and silver wrapper. [AR 57-58]  In the ALJ's second hypothetical, "because of exacerbations of symptoms periodically [this] person would be off task for between 15 and 20 percent of the workweek."  [AR 58]  The VE testified that the second hypothetical "would eliminate work."  *Id.*  The Plaintiff's attorney asked the VE, "[I]f an individual is severely limited, [] but not precluded in all circumstances with regard to their ability to make simple, work related decisions, perform at a consistent pace, and deal with criticism[,] [w]ould that affect their ability to engage in gainful work in the work you described?" [AR 59 (extraneous words excluded)]  The VE testified that this hypothetical would "preclude

9

work." *Id.*

The ALJ issued an unfavorable decision on July 1, 2013.  [AR 8-29]

**LEGAL STANDARDS**

**I.      SSA's Five-Step Process for Determining Disability**

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet

the insured status requirements of these sections, be under age 65, file an application for SSI for a

period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423, 1382.

Additionally, SSI requires that an individual meet income, resource, and other relevant requirements.

*See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation

process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of

the Social Security Act, which is generally defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137,

140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful

activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. § 416.920.  Step Two is a

determination of whether the claimant has a medically severe impairment or combination of

impairments as governed by 20 C.F.R. § 416.920(c).  If the claimant is unable to show that her

impairment(s) would have more than a minimal effect on her ability to do basic work activities, she

is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed RFC prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. § 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. § 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion."

11

*Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff is capable of working in "a low-stress environment with work duties that should not require social interaction with the general public, but she can tolerate occasional social interaction with co-workers, and in this environment is able to tolerate supervision, work changes, travel, plan and set goals, and recognize and avoid workplace hazards."  [AR 24] Going through the five-step process, the ALJ found Plaintiff had not engaged in substantial gainful activity since October 20, 2011, the application date (Step One).  [AR 13]  Further, the ALJ determined Plaintiff has the following severe impairments: "bipolar disorder, not otherwise specified; personality disorder; anxiety disorder" (Step Two).  *Id.*

Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).  [AR 13]  In making that finding, the ALJ noted that she considered whether the "paragraph B" criteria were satisfied:

> To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining

concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

*Id.*; *see also* 20 C.F.R. § 404.1529(b).  The "paragraph B" criteria were not satisfied because "the claimant's mental impairments result in no more than a mild restriction of her activities of daily living, moderate difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence or pace, and have resulted in no episodes of decompensation."

[AR 14]  The "C" criteria were also not satisfied because:

the evidence does not demonstrate repeated episodes of decompensation, each of extended duration, such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation, inability to function outside a highly supportive living arrangement, nor is there evidence of a complete inability to function independently outside the area of her home.

*Id.*; *see also* 20 C.F.R. § 404.1529(c).  The ALJ noted that her findings on the "B" and "C" criteria were "consistent with the state agency psychiatric consultant assessment from Dr. Ryan[.]" [AR 14]

The ALJ then determined that Plaintiff had the RFC to perform:

a full range of work at all exertional levels but with the following nonexertional limitations: she is able to understand, remember and carry out moderately complex instructions that can be learned in 6 months; she can sustain concentration, persistence, and pace consistent with the above-noted limitation in a low-stress environment; low stress is defined as work duties that should not require social interaction with the general public, but can tolerate occasional social interaction with co-workers and in this environment is able to tolerate supervision, work changes, travel, plan and set goals, and recognize and avoid workplace hazards.

[AR 15] The RFC assessment:

is supported by the available objective medical evidence of record, showing that

> while claimant has notable difficulty with anxiety and being around others, she is not completely without social interaction and has several friends and is currently married, having met her husband through a group of friends, she is also able to care for her young son on occasion, cares for herself, and demonstrates a greater level of concentration, focus, and general mental health functioning given that she reads and uses her computer daily, including playing non-simplistic online computer games, as well as other reported activities in the function report discussed above [].

[AR 24 (internal citations omitted)]  The ALJ further noted that the RFC "is supported by the state agency psychiatric consultant assessment [], generally by the psychological consultative examination [], and to a certain extent, the medical source statement provided by Dr. Swisher[.]"  *Id.* (internal citations omitted).  The state agency psychiatric consultant assessment performed by Dr. Ryan was found to be persuasive and assigned "significant weight, as it is consistent with and supported by the medical evidence of the record."  [AR 23]  The psychological consultative examination performed by Dr. Ackerman was persuasive, but only assigned "some weight" because Dr. Ackerman's opinions did "not appear to be fully supported by the examination findings[.]"  [AR 22]  The ALJ acknowledged the medical source statement prepared by Dr. Swisher, but was "unsure of the level of treatment actually provided by Dr. Swisher."  [AR 23-24]  Additionally, the "more significant restrictions provided [by Dr. Swisher] are not supported by the record as a whole[.]"  [AR 24]  The ALJ also noted that she found Plaintiff "to be only partly credible with regard to her reported symptoms/limitations."  [AR 22]

The ALJ went on to determine that Plaintiff had no past relevant work (Step Four), and that considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform jobs existing in significant numbers in the national economy.  [AR 24-25] As a result, the ALJ concluded (at Step Five) that Plaintiff was not disabled and, therefore, was not under a disability as defined by

the SSA.  [AR 26]  Plaintiff sought review of the ALJ's decision by the Appeals Council on

September 5, 2013.  [AR 7]  On September 26, 2014, the Appeals Council notified Plaintiff that it

had determined it had "no reason" under the rules to review the decision, making the ALJ's decision

final.  [AR 1-6]  Plaintiff timely filed her Complaint in this matter on March 30, 2015.  *See*

Complaint, docket #2.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following two issues: (1) the ALJ failed to properly apply the

correct legal standard by not providing controlling weight to the opinion of a treating physician; and

(2) substantial evidence did not support the ALJ's decision to give great weight to the opinion of a

reviewing physician.

## ANALYSIS

## I.      Whether the ALJ Properly Applied the Correct Legal Standard when Evaluating the Opinion of a Treating Physician

Plaintiff argues that the ALJ did not give "controlling weight" to the opinions of Plaintiff's

treating physician – Dr. Swisher – as the ALJ should have done if the opinion was "well supported

by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent

with the other substantial evidence in the  record."  Opening Brief, docket #15 at 9.  Defendant

disagrees and indicates that the ALJ "reasonably determined that Dr. Swisher's opinion as to

Plaintiff's mental limitations was entitled to varying weight depending on whether his specific

conclusions had support in the record as a whole[,]" and thus the opinion should be affirmed.

Response, docket #16 at 12.

According to the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2). In fact, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995). A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330. To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [...] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying SSR 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step because "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Watkins*, 350 F.3d at 1300.  At the second step, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.  If this is not done, remand is mandatory.  *Id.*  As SSR 96-2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§] 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4) (emphasis added).  Hence, the absence of a condition for controlling weight raises, but does not resolve the second, distinct question of how much weight to give the opinion.  *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis"). In weighing the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon

17

which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331.  However, an ALJ is not required to "apply expressly" every relevant factor for weighing opinion evidence.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  For example, when an ALJ cited several exhibits, having summarized those exhibits earlier, and explained the basis for his finding, the ALJ had done enough to weigh the opinion evidence.  *See Endris v. Astrue*, No 12-6126, 2012 WL 6685446, at *2-3 (10th Cir. Dec. 26, 2012).  In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion."  *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Without these findings, remand is required.  *Watkins*, 350 F.3d at 1300–01; *accord Krauser*, 638 F.3d at 1330.  Lastly, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so.  *Watkins*, 350 F.3d at 1301.  The ALJ may reasonably discount a treating physician's opinion that was inconsistent with statements from the claimant.  *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078-79 (10th Cir. 2007).  The ALJ must consider consistency of notes from the treating physician.  *See Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  The ALJ also must consider whether an opinion is consistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(4).

Here, the Defendant argues that the ALJ reasonably determined that Dr. Swisher's opinions as to Plaintiff's mental limitations were entitled to varying weight depending on whether his specific conclusions had support in the record as a whole.  Response, docket #16 at 12.  The ALJ's opinion

indicates that she considered the medical opinions of the treating doctor as follows:

> [T]hough the undersigned is generally in concurrence with the opinion that the claimant has only "limited but satisfactory" restriction is several areas, including her ability to understand, remember and carry out detailed instructions, to set realistic goals or make plans independently of others, to adhere to basic standards of neatness and cleanliness, to sustain ordinary routine without special supervision, and notably, to maintain regular attendance and be punctual within customary, usually strict tolerances, the more significant restrictions provided are not supported by the record as a whole[.]

[AR 24] The ALJ noted she did not give Dr. Swisher's opinion controlling weight because "the opinion is [not] consistent with other substantial evidence in the record[.]" *See Watkins*, 350 F.3d at 1300 (applying SSR 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Additionally, because "consistency between the opinion and the record as a whole" is one of the factors to be considered when assigning weight to the opinion of a treating physician, the ALJ reasonably could have given less weight to Dr. Swisher's conclusions that were not supported by the record as a whole. *See Krauser*, 638 F.3d at 1331. The ALJ also questioned the level of treatment actually provided by Dr. Swisher, noting:

> Dr. Swisher indicated bi-weekly psychotherapy sessions since March 26, 2012 for a total of 24 sessions bteween March 26, 2012 and May 7, 2013, and he apparently met with the claimant on the day the questionnaire was completed; in addition, the claimant testified that she generally has seen him every two weeks or so over the past year; however, the record shows Dr. Swisher's name attached to only Service Plan Updates in May and December 2012. Accordingly, the undersigned notes that there are no treatment notes with Dr. Swisher to substantiate the restrictions provided in the mental residual functional capacity questionnaire, nor are the treatment records that are in the file supportive of the level of restriction noted.

[AR 23-24 (internal citations omitted)] Because "the length of the treatment relationship and the frequency of examination" is one of the factors to be considered when assigning weight to the

opinion of a treating physician, the ALJ reasonably could have given less weight to Dr. Swisher's conclusions given that the level of treatment provided was in question. *See Krauser*, 638 F.3d at 1331.

Furthermore, the opinion explains that the treating physician's opinion was discounted because the Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible[.]"  [AR 17]  While Plaintiff's Opening Brief does not address these concerns [*see generally* Plaintiff's Opening Brief, docket #15], the ALJ provided a detailed description of her findings regarding why Plaintiff's assertions were not entirely credible.  Questions about Plaintiff's credibility help to explain why the ALJ determined that "the more significant restrictions provided [by Dr. Swisher] are not supported by the record as a whole[.]"  [AR 24]  For example, the  ALJ focused on how Plaintiff's medication usage affected her credibility, noting Plaintiff refused medication and met with a therapist only sporadically during 2011. [AR 18]  The ALJ said that this negatively impacted Plaintiff's credibility, cocluding "that her allegations for disability are perhaps overstated." *Id.*  The ALJ similarly drew attention to progress notes from a July 10, 2012 medication management session in which Plaintiff reported "doing well since starting Vyvanse[,]" noting "these progress notes in particular do not support claimant's allegations of disability." [AR 19]  The ALJ also discussed the progress notes from a February 2013 medication management session in which Plaintiff indicated that she forgets to take her evening dose of buspirone, finding Plaintiff's noncompliance with her medications "diminishes the persuasiveness of her allegations." [AR 20]

Additionally, the ALJ found that Plaintiff's daily activities and social contacts negatively

impacted her credibility.  The ALJ drew attention to Plaintiff's claim that she "is good with computers, loves to read, and enjoys playing games[,]" stating that "this level of activity with regard to reading, computers, and playing games, is not necessarily consistent with the claimant's allegations of disabling difficulty associated with mental health functioning, namely with focus and concentration[.]"  [AR 18]  Plaintiff also has a support system, which includes her husband and several close friends, and attends movie screenings with a group of friends, all of which led the ALJ to conclude that "[t]his shows a greater level of social interaction and being in public than claimant alleges she is capable of performing[.]"  *Id.*  Finally, the ALJ noted Plaintiff "report[ed] that she is thinking about returning to the workforce, which necessarily contradicts her allegations that she is unable to work."  [AR 19]

The ALJ reasonably could have discounted the treating physician's opinion, noting that Dr. Swisher's conclusions were not supported by the opinion as a whole and that there were no treatment records to confirm the level of care provided.  Additionally, the ALJ raised reasonable questions regarding Plaintiff's credibility.  For these reasons the Court finds that substantial evidence supports the ALJ's evaluation of the opinion of the treating physician.

## II.     Whether the ALJ Properly Applied the Correct Legal Standard when Evaluating the Opinion of a Reviewing Physician

The Plaintiff argues that "[s]ubstantial evidence does not support the [ALJ's] decision to give great weight to the opinion of Dr. Ryan."  Opening Brief, docket #15 at 13.  Plaintiff supports this argument by noting "there was significant additional medical evidence received from treating psychologists and therapists which contradicted Dr. Ryan's conclusion."  *Id.*  The Court construes

this argument as a weight of opinion issue and uses the same factors discussed above to determine if the ALJ weighed the opinion correctly. *See Krauser*, 638 F.3d at 1331. Here, the Court is dealing with the opinion of a reviewing physician, not a treating physician. Therefore, the Court does not need to determine if the opinion is controlling, but only whether the ALJ weighed it properly.

Defendant argues and the Court agrees that "while the ALJ gave Dr. Ryan's opinion 'significant weight,' she did not rely on his opinion as the sole piece of evidence to support her decision. The ALJ conducted a full and thorough evaluation of all the evidence, including medical opinions[.]" Response, docket #16 at 11. When discussing Dr. Ryan's opinion, the ALJ explained that she "finds this assessment persuasive and assigns it significant weight, as it is consistent with and supported by the medical evidence of the record." [AR 23] The ALJ also noted that Dr. Ryan's opinion is "generally supported by the psychological consultative examination findings[.]" *Id.*

As discussed above, it is appropriate for an ALJ to assign greater weight to a medical opinion that is consistent with the whole. *See Krauser*, 638 F.3d at 1331. Considering the ALJ's questions regarding the Plaintiff's credibility, it is reasonable that the ALJ found Dr. Ryan's testimony to be more consistent with the record as a whole than the other medical opinion evidence presented. [*See* AR 17] Additionally, the ALJ's reference to the "psychological consultative examination findings" demonstrates that the ALJ considered other medical opinions. [*See* AR 23] The ALJ further demonstrated her consideration of other medical opinions when she stated "the RFC is supported by the state agency psychiatric consultant assessment [], generally by the psychological consultative examination [], and to a certain extent, the medical source statement provided by Dr. Swisher[.]" [*See* AR 24 (internal citations omitted)]

22

The ALJ reasonably could have given "significant weight" to Dr. Ryan's opinion, noting it was supported by the record as a whole. The ALJ also reasonably considered other medical opinions. For these reasons the Court finds that substantial evidence supports the ALJ's evaluation of the opinion of the reviewing physician.

## **CONCLUSION**

For the foregoing reasons, the Court concludes the ALJ properly applied the correct legal standard when evaluating the medical evidence and assigning an RFC to Plaintiff . The Court finds the final decision is supported by substantial evidence in the record as a whole and the correct legal standards were applied. Therefore, the decision of the ALJ that Plaintiff Nancy Halsted was not disabled is **affirmed**.

Dated at Denver, Colorado this 8th day of October, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge